**INNER CITY BROADCASTING CORP., et al., Plaintiffs,**

v.

**Michael CARDENAS, Administrator, Small Business Administration, et al., Defendants.**

**Civ. A. No. 82–269.**

United States District Court, District of Columbia.

Nov. 4, 1982.

Noah N. Atkinson, Jr., Philadelphia, Pa., Roma J. Stewart, Washington, D.C., for plaintiffs.

John D. Bates, Asst. U.S. Atty., Civ. Div., Washington, D.C., for defendants.

MEMORANDUM OPINION

FLANNERY, District Judge.

## I. Introduction

This matter is before the court on the motion of defendants Small Business Administration ("SBA") and its administrator Sanders to dismiss or, in the alternative, for summary judgment, and on the motion of defendant Federal Railroad Administration ("FRA") to dismiss. Plaintiffs Inner City Broadcasting Corporation ("Inner City") and its subsidiary, Amistad DOT Venture Capital, Inc. ("Amistad") seek a declaratory judgment to require the SBA to consider $3 million Amistad has received in aid from the FRA as "private" capital for the purposes of calculating the amount of financial aid Amistad may be eligible to receive from the SBA. The SBA has filed a counterclaim for interest due it on $1 million in Amistad debentures it purchased in January, 1981. For the reasons set forth below, the court grants FRA's motion to dismiss and grants SBA's motion for summary judgment on its counterclaim, but denies the motion of the SBA for summary judgment on the issue of SBA leveraging of FRA funds. Instead, on that issue, the court shall enter summary judgment for the plaintiffs.[1]

## II. Facts

■ In March 1978 Inner City representatives met with officials of the Minority Business Resource Center ("MBRC") of the FRA to inquire about obtaining MBRC financial assistance in setting up a venture capital company to invest in minority-controlled businesses in railroad-related businesses.[2] After fruitful initial discussions, the FRA in mid-April 1978 invited Inner City to submit a formal proposal to participate in the MBRC program. Inner City did so in May, offering to set up a minority enterprise small business investment company ("MESBIC") with $500,000 of Inner City capital. In early November 1978 the FRA accepted Inner City's proposal and agreed to provide funds to the MESBIC through the purchase of $3 million of its preferred stock. The FRA acceptance was subject to the condition that the MESBIC be promptly established and that it obtain within four months a license from the SBA under section 301(d) of the Small Business Investment Act of 1958, as amended, 15 U.S.C. § 681(d) (1976 & Supp. IV 1980). Sutton Affidavit, Exhibit J.[3]

Under provisions of the Small Business Investment Act of 1958 the SBA gives financial assistance to small business investment companies meeting certain requirements. One way a company may qualify for SBA assistance is to fall within section 301(d) of the Act, which provides:

> [A] small business investment company, the investment policy of which is that its investments will be made solely in small business concerns which will contribute to a well-balanced national economy by facilitating ownership in such concerns by persons whose participation in the free enterprise system is hampered because of social or economic disadvantages, may be organized and chartered under State business or non-profit corporation statutes, or formed as a limited partnership, and may be licensed by the Administra-

---

1. Although plaintiffs filed no cross-motion for summary judgment and contend that triable issues of fact remain, the court has the power to enter summary judgment in favor of the nonmoving party where, as here, it finds that there exist no genuine issues of material fact and that the non-moving party is entitled to judgment as a matter of law. *Morrissey v. Curran,* 423 F.2d 393, 399 (2d Cir.1970), *cert. denied,* 400 U.S. 826, 91 S.Ct. 52, 27 L.Ed.2d 56 (1971); *National Savings and Trust Co. v. Sarolea,* 269 F.Supp. 4, 7 (D.D.C.1967); *see* 6 Moore's Federal Practice ¶ 56.12 (2d ed.1976).

2. Pursuant to 49 U.S.C. § 1657a, the MBRC is authorized, *inter alia,* to "develop support mechanisms, including venture capital ... organizations, ... which will enable minority entrepreneurs and businesses to take advantage of business opportunities related to the maintenance, rehabilitation, restructuring, improvement and revitalization of the Nation's railroads." 49 U.S.C. § 1657a(c)(6).

3. The affidavit of Percy E. Sutton, Chairman of Inner City and President and Chairman of Amistad, was submitted in support of plaintiffs' opposition to defendants' motions.

tion to operate under the provisions of this chapter.

15 U.S.C. § 681(d) (1976 & Supp. IV 1980). A section 301(d) licensee is eligible to receive financial aid in the form of the purchase by the SBA of non-voting stock of the company up to an amount equal to 200 per cent of the company's private paid-in capital and surplus or in the form of the purchase or guarantee by the SBA of debentures of the company up to an amount equal to 400 per cent of the company's private paid-in capital and surplus. 15 U.S.C. § 683(c). Such SBA aid is referred to as "leveraging" due to its multiplier effect.

To meet the conditions of the FRA, Inner City on November 16, 1978 incorporated Amistad. On November 21 Amistad submitted an application to the SBA for a section 301(d) license. On February 20, 1979 Inner City made a capital contribution to Amistad of $500,000 in its own funds. A week later the SBA granted Amistad the license.

Once Amistad met all of the FRA conditions, the FRA and Amistad began negotiations with respect to the FRA purchase of Amistad stock. The negotiations ended successfully with the signing on May 23, 1979 of a 58-page financing agreement. SBA Administrative Record ("Record") at 35.[4] The FRA paid over $3 million to Amistad in September 1979.

The financing agreement by its terms had to be approved by the SBA before the FRA would transfer the money. It also required Amistad to obtain at least $3 million in additional financing from the SBA based on leveraging of the FRA funds. Failure to do so would be an event of default giving the FRA the right to force Amistad to redeem the shares and pay back the $3 million in FRA funds. Consequently, Amistad in late May 1979 submitted the agreement to the SBA for its approval and at about the same time wrote to the SBA asking informally for its commitment to

leverage the $3 million from the FRA. The SBA had already given Amistad $500,000 in exchange for preferred shares following an earlier request to leverage the $500,000 capital contribution of Inner City. On June 6, 1979 the SBA formally approved the FRA-Amistad financing agreement, but noted that "this approval is not intended to commit the agency to the provision of matching funds or leverage on the basis of investments by DOT (Department of Transportation)." Record at 99. Two days later the SBA refused Amistad's informal request citing "a severe shortfall in funds." Record at 32. Undaunted, Amistad on October 3, 1979 submitted a formal application. The SBA in April 1980 again refused, this time citing as its reason the high percentage of funds held by Amistad which lay idle and uninvested. Record at 143; 15–16.

Throughout the two years following Inner City's initial contacts with the FRA in March 1978 until April 1980, neither the FRA nor the SBA questioned the legality of SBA leveraging of FRA funds. The record in fact contains numerous representations to the contrary. At the outset, the FRA attached to its invitation to Inner City in April 1978 to apply for MBRC aid a pamphlet entitled, "Investment Company for Railroad Venders: A Synopsis of the Implementation." It stated:

> The MESBIC would be a section 301(d) licensee able to obtain matching funds at a low rate of interest from the SBA, in an amount up to four (4) times the capital which it possess (sic) *including funds invested by the MBRC.*"

Sutton Affidavit, Exhibit E (emphasis added). Moreover, the FRA-Amistad financing agreement reflects the expectation of SBA leveraging. It refers to the proceeds "from the subsequent sale of preferred shares and debentures to the SBA *by reason of FRA's purchase of Shares.*" Record at 56 (Emphasis added). It requires Amistad to keep FRA funds separate from its general accounts "until the SBA (i) purchases an

---

**4.** The SBA Administrative Record is appended to the affidavit of Lawrence F. Friess, Director, Small Business Investment Company Opera-

tions, SBA, in support of defendants' motion to dismiss or, in the alternative, for summary judgment.

aggregate of three million ($3,000,000) of preferred shares of (Amistad) by reason of FRA's purchase of shares or (ii) commits in writing to do so." Record at 43. Finally, it provides as an event of default the

> [f]ailure of [Amistad] to either (i) sell to SBA an aggregate of three million ($3,000,000) of preferred shares of (Amistad) by reason of the [FRA's] purchase of the Shares or (ii) obtain a written commitment by SBA to purchase such amount of preferred shares within three (3) months after the closing under Section 2.01(c) of this agreement.

Record at 88.

For its part, the SBA, though always careful to avoid giving any formal commitment to leverage FRA funds held by Amistad, never claimed illegality as a basis for its refusal, but pointed instead to budget constraints or irregularities in Amistad's application. In fact, the SBA often clearly stated it had the power to leverage FRA money. For example, in a letter dated April 2, 1980 to Rep. Charles B. Rangel, who had contacted the SBA on Amistad's behalf, the SBA said it was

> aware that the terms of FRA's investment oblige Amistad to seek matching funds from SBA. SBA has no consequent legal obligation toward FRA, or towards Amistad, *other than to regard the proceeds of the FRA financing as private capital for leverage purposes.*

Record at 15 (emphasis added). The same letter elsewhere states "there is no doubt that funds supplied by FRA qualify as private capital for matching purposes." *Id.*

Indeed, the SBA's own regulations at the time provided that FRA funds could be leveraged:

> *Nonprivate funds for licensees.* (i) A licensee may include nonprivate funds ... in its Private Capital for purposes of sections 302(a), 303(c), and 306 of the Act....
>
> (ii) For purposes of this paragraph (d)(2), "nonprivate funds" shall mean funds obtained, directly or indirectly, from another agency or department of the Feder-

al Government or from any State or subdivision thereof ....

13 C.F.R. § 107.101(d)(2) (1982).

However, in April 1980, shortly after the SBA had rejected Amistad's first application, the General Accounting Office ("GAO") sent a letter to the SBA questioning SBA authority to leverage nonprivate funds and asking for SBA comment. The GAO based its interpretation on the plain language of the statute which limited leveraging to private paid-in capital and surplus. In a reply dated June 16, 1980, the SBA defended its prior policy but acquiesced in the GAO interpretation. The Comptroller General subsequently issued a formal decision on July 29, 1980 embodying the GAO interpretation and prohibiting the SBA from leveraging funds contributed by other governmental agencies unless Congress explicitly so allowed in the law providing for assistance by that agency. Record at 159–161.

At the same time, Amistad persisted. It submitted a second, third and fourth application for leveraging of FRA funds in June and October 1980 and July 1981. Each time the SBA refused, citing the Comptroller General's July 29, 1980 decision. However, the SBA in January 1981 did provide Amistad $1.5 million ($1 million in debentures and $500,000 in preferred shares) as additional leverage of Inner City's original $500,000 contribution, bringing total SBA aid to Amistad to $2 million.

In January 1982 Amistad defaulted on the payment of $25,000 in interest on the $1 million in debentures it had sold to the SBA a year earlier. Claiming the SBA's refusal to leverage FRA money prevented it from making the interest payments, Amistad brought this action on January 25, 1982. Two weeks later it notified the SBA of its intention to refuse to make interest payments during the pendency of this suit.

## III. *Discussion*

### A. *FRA motion to dismiss*

Plaintiffs in their complaint named the FRA as a defendant, yet in their prayer for

relief sought no relief from the FRA. The FRA responded by filing a motion to dismiss the suit as against it for lack of subject matter jurisdiction due to the absence of a case or controversy and for failure to state a claim upon which relief can be granted. Plaintiffs responded with a motion for leave to amend their complaint to allege that FRA representatives, while holding themselves out as having the authority to do so, promised plaintiffs that the SBA would leverage FRA funds. The proposed amendment also claims $500,000 in damages against the FRA.

■ Although Federal Rule of Civil Procedure 15(a) provides that leave to amend shall be provided freely, leave to amend a complaint may properly be denied if the complaint as amended would be subject to a motion to dismiss under F.R.Civ.P. 12(b)(6). *Collyard v. Washington Capitals,* 477 F.Supp. 1247, 1249 (D.Minn.1979); *see* 3 Moore's Federal Practice ¶ 15.08(4) (2d ed. 1980).

■ In the case at bar, although the legal basis of plaintiffs' claims against the FRA is not clear, it would appear that plaintiffs are seeking damages for having relied to their detriment on FRA assurances of SBA leveraging. A cause of action alleging detrimental reliance, however, sounds in contract. The jurisdiction of the district court is limited by the Tucker Act in contract actions to claims amounting to less than $10,000, for which the district court has concurrent jurisdiction with the Court of Claims. 28 U.S.C. § 1346(a)(2) (1976). For all contract claims in excess of $10,000 the jurisdiction in the Court of Claims is exclusive. *Putnam Mills Corp. v. United States,* 432 F.2d 553, 554 (2d Cir.1970); *see* 28 U.S.C. § 1491 (1976); *cf. Cenna v. United States,* 402 F.2d 168, 170 (3d Cir.1970) (claim based on quantum meruit in excess of $10,000 sounds in contract and district court without jurisdiction to hear suit since exclusive jurisdiction was with the Court of Claims). Even if plaintiffs' motion to amend were granted, therefore the complaint would be subject to a motion to dismiss since the court would be without juris-

diction to hear the claims. Given that plaintiffs in their original complaint sought no relief from the FRA, their suit against the FRA must be dismissed for failure to state a claim upon which relief can be granted.

B. *SBA motion to dismiss or, in the alternative, for summary judgment*

1. *Parties' arguments*

Plaintiffs in their complaint allege that the SBA has unlawfully refused the application of Amistad for SBA financial aid and seek a declaratory judgment that the SBA shall consider the FRA funds contributed to Amistad as "private" capital for the purposes of Amistad's application for SBA leveraging.

Defendant SBA advances two arguments in support of its motion to dismiss and/or for summary judgment. First, the SBA argues that its refusal to grant aid to Amistad was a discretionary act and that the Small Business Act of 1958 by its terms prevents this court from issuing an injunction to compel the SBA Administrator to perform an act committed to his discretion. 15 U.S.C. § 634(b)(1) (1976) states in pertinent part that "no ... attachment, injunction, garnishment, or other similar process ... shall be issued against the Administrator or his property." Consequently, defendant argues, this court is powerless to grant the relief plaintiffs seek and so must dismiss their complaint for failure to state a claim upon which relief can be granted.

In the alternative, defendant argues that the SBA decision to refuse to disburse funds in contravention of a clear Comptroller General decision that such disbursement would be illegal was not arbitrary or capricious and as such defendant is entitled to judgment as a matter of law. Defendant contends that the scope of judicial review of the SBA action is the narrow one provided in Section 706 of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (1977) ("APA"), which provides in pertinent part that a reviewing court shall:

.   .   .   .   .

(2) hold unlawful and set aside agency actions, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .

5 U.S.C. § 706(2)(A) (1977). *See also, Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

In support of its argument that the SBA's acquiescence in the GAO decision was not arbitrary or capricious, defendant details the relationship between the GAO and agencies of the executive branch. The GAO, headed by the Comptroller General is an independent agency within the legislative branch which serves as a watchdog to ensure the proper disbursement of public monies. *See generally,* J. Cibinic, Jr. and J. Lasken, *The Comptroller General and Government Contracts,* 38 Geo.Wash.L.Rev. 349 (1970). All claims upon the U.S. must be settled by the GAO, 31 U.S.C. § 71 (1976), and all public accounts are subject upon closing to certification by the GAO, which certification is final and conclusive upon the Executive Branch. 31 U.S.C. § 74 (1976). Furthermore, public officials responsible for disbursement of federal funds may be held personally accountable for any improper or illegal payment they make. 31 U.S.C. §§ 82b, 82c (1976). Disbursing officials who are uncertain about the propriety of a particular payment may apply for an advance decision by the Comptroller General pursuant to 31 U.S.C. § 74 (1976).

In the case at bar, defendant argues, the GAO has in effect rendered an advance decision to the SBA[5] that any financial aid disbursements made by its officials which consisted of the leveraging of funds contributed to small businesses by other federal agencies would be unlawful. Only at great risk of personal liability would an SBA official order monies to be spent in contravention of a Comptroller General decision. In view of that risk, defendant concludes, the SBA's refusal to consider as private capital the $3 million contributed by the FRA to Amistad cannot be considered arbitrary or capricious.

In opposing defendant's motion for summary judgment, plaintiffs agree that the proper standard or review for this court to apply is to ask if the SBA's action is arbitrary or capricious. They argue, however, that the SBA's abrupt reversal of its prior policy towards leveraging of other federal funds, a reversal without notice to any interested party, including Amistad, constitutes precisely the arbitrary, heavy-handed behavior that Congress, in providing for judicial review under the APA, sought to prevent. Secondly, plaintiffs argue that since Inner City, in investing $500,000 in Amistad, reasonably relied on assurances that FRA funds would be leveraged by the SBA, the government is equitably estopped from now asserting that such leveraging would be unlawful.

### 2. Judicial review of SBA action

◼ Defendant correctly asserts that the court may not compel the Administrator of the SBA to perform an act within his discretion and committed to his judgment. Defendant also correctly asserts that this court may undo agency action only if it is arbitrary or capricious. But defendant's argument is misplaced. The court, it is true, may not order the SBA to rule favorably on the application of Amistad for financial aid. *See Miguel v. McCarl,* 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901 (1934) ("Mandamus is . . . not [employed] to direct the exercise of judgment or discretion in a particular way nor to direct the retraction or reversal of action already taken in the exercise of ei-

---

**5.** By its terms 31 U.S.C. § 74 (1976) allows the GAO to issue advance decisions only upon the application of interested disbursing officers or agency heads. In the instant case, since no one at the SBA solicited the Comptroller General's decision, the source of his authority to issue that decision is not clear. The court shall assume, however, for the purposes of deciding this case, that the Comptroller General's authority to initiate advance decisions may be implied from the statute. *Cf. U.S. ex rel. Brookfield Construction Co., Inc. v. Stewart,* 234 F.Supp. 94 (D.D.C.1964), *aff'd* 339 F.2d 753 (D.C.Cir.1964) (even in absence of explicit provision, Comptroller General authority to issue advance rulings implied within his functions).

ther."); *cf. United States v. Capital Assistance Corp.,* 460 F.2d 256 (9th Cir.1972), *cert. denied,* 409 U.S. 941, 93 S.Ct. 233, 34 L.Ed.2d 193 (1972) (renewal of loan committed to SBA discretion and therefore excepted from judicial review). It is, however, within the province of the court to correct any misinterpretation of law the SBA or the GAO may have made in considering that application. Final authority for the interpretation of a statute lies not in any executive agency but in the court. *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968). As Section 706 of the APA, cited by defendant, clearly states: "[T]he reviewing court shall decide all relevant questions of law [and] interpret constitutional and statutory provisions . . . ." 5 U.S.C. § 706 (1976).

█ In deciding such questions of statutory interpretation, a court may accord deference to the interpretation of an agency if the agency possesses special expertise, is charged with enforcement of the statute, and if its interpretation was contemporaneous with the passage of the statute and reflects long-standing agency practice. *See General Electric Co. v. Gilbert,* 429 U.S. 125, 141–42, 410–11, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). But even where such deference is appropriate, an agency's statutory interpretation merely provides "guidance" to the court and is not controlling. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *see generally* 2 K. Davis, Administrative Law Treatise § 7:8 (2d ed.1979). In the instant case, moreover, none of the factors weighing in favor of deference is present. The GAO possesses no technical expertise with respect to SBA operations, the Comptroller General's decision came long after the passage of the 1972 amendment to the Small Business Act of 1958 at issue, and it reversed prior SBA practice [6] while citing nothing in the legislative history to support its conclusions.

The court in *Green County Planning Board v. Federal Power Commission,* 559 F.2d 1227 (2d Cir.1976) was also presented with the question of the weight to be given to a GAO interpretation of a statute. In that case, localities and conservation groups challenged the award by the Federal Power Commission ("FPC") to an electric utility of a permit for the construction of a power line through a scenic rural valley in New York. In the final of four rounds of litigation before the Second Circuit the sole remaining issue was whether the FPC had the statutory authority to award legal fees and costs to the various intervenors in the case. In an earlier decision the court had concluded that the FPC had no such authority.[7] Subsequent to that decision, however, the Comptroller General issued an opinion that the FPC did have the authority to award attorney's fees and costs. On appeal in 1977, a three-judge panel of the Second Circuit reversed that portion of its earlier order denying fees and costs and remanded the case to the FPC for consideration of the parties' application. 559 F.2d at 1234–35. In a rehearing of the case, however, an *en banc* panel overturned that decision and strongly affirmed the court's predominant role in statutory interpretation. The court wrote:

We are thus met squarely with the issue of whether this Court's interpretation of the Federal Power Act or that of the Comptroller General shall control the disposition of this appeal. We hold that our interpretation must control.

Congress has specifically provided that "[t]o the extent necessary to decision . . . the reviewing court shall decide all relevant questions of law," and "interpret constitutional and statutory provisions" . . . and shall "hold unlawful and set aside agency action . . . in excess of statutory jurisdiction, authority or limitations

---

**6.** Prior to the decision of the Comptroller General, the SBA had provided by regulation that "private" capital could include nonprivate funds. 13 C.F.R. § 107.102(d)(2). The text of these regulations is set out at p. 46, *supra.* *See also* n. 14, *infra.*

**7.** *Green County Planning Board v. Federal Power Commission,* 455 F.2d 412 (2d Cir.1972), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972).

...." 5 U.S.C. § 706. We are not prepared to abdicate the responsibility thus conferred by holding that the authority of the Federal Power Commission is to be determined by the Comptroller General's interpretation of the law rather than our own.

. . . . .

It is for the courts to determine the intent of Congress as expressed in its legislative enactments....

The authority of a Commission to disburse funds must come from Congress, and it is for Congress, not the Comptroller General, to set the conditions under which payments, if any, should be made. 559 F.2d at 1238–39 (citations omitted).[8]

In sum, the ultimate question in this case is one of statutory construction: whether in Section 303(c) of the Small Business Investment Act of 1958, as amended 15 U.S.C. § 683(c), the terms "private paid-in capital and surplus" upon which the SBA bases its calculations of the amount of financial aid applicants such as Amistad are eligible to receive may not include funds received from government agencies other than the SBA. In interpreting this statute, this court, like the court in *Green County Planning Board,* shall do so unfettered by the prior construction of the Comptroller General.

3. *The meaning of "private paid-in capital and surplus" in Section 303(c)*

■ Although resolution of this case turns on the meaning to be given the word "private" in Section 303(c) of the Small Business Investment Act of 1958, as amended, 15 U.S.C. § 683(c) (1976 & Supp. IV 1980), neither party has conducted a careful analysis of that provision. Indeed, the analysis of the Comptroller General in his July 1980 decision consisted of reprinting the language of the statute while underlining the word "private", concluding "private" must mean nongovernmental, and

adding: "We are aware of nothing in the law or legislative history that suggests otherwise." Record at 159–61. An accurate understanding of Section 303(c) requires a closer examination of the legislative history of the Small Business Investment Act of 1958.

Concerned with the obstacles faced by small businesses in obtaining adequate long-term financing, the Congress in 1958 enacted the Small Business Investment Act of 1958. Pub.L. No. 85–699, 72 Stat. 689 (1958) (current version at 15 U.S.C. § 661 *et seq.* (1976) (hereinafter the "1958 Act"). The purpose of the act was to make available to small companies the equity capital and long-term credit such companies were unable to obtain from private institutions. S.Rep. No. 1652, 85th Cong., 2d Sess. 2 (1958) (hereinafter "1958 Senate Report"). The means Congress chose to provide that capital was via the intermediary of small business investment companies ("SBICs") to be formed under the auspices of a newly-created Small Business Investment Division within the SBA. The SBICs were designed to attract private capital, *id.* at 12, which would in turn be invested by the SBICs in the small businesses Congress sought to help. To encourage the formation of SBICs, Congress authorized the SBA to make an initial capital contribution of up to $150,000 to each. 1958 Act, § 302(a); 1958 Senate Report at 11. To encourage their growth, in the section of the act which is the predecessor of the section at issue before the court, Congress authorized the SBA to make loans to SBICs on favorable terms. 1958 Act, § 303; 1958 Senate Report at 11–12. From the beginning, however, Congress has limited the amount of aid the SBA could provide to SBICs and has defined the limit in terms of a percentage of the SBIC's paid-in capital and surplus. As originally enacted, the 1958 Act limited the amount of loans the SBA could make to SBICs to 50 percent of the company's paid-

---

**8.** It is worthy of note that the majority in *Green County Planning Board* declined to give the Comptroller General's opinion even the modicum of deference courts given an enforcing agency's statutory interpretations, as three dissenting judges urged it to do. *See* 559 F.2d at 1242.

in capital and surplus. Interestingly, for the purposes of calculating this limit, the original SBA contribution under section 302(a) of up to $150,000 was deemed to be a part of the company's paid-in capital and surplus. 1958 Act, § 302(a); 1958 Senate Report at 11–12.

Over the years the Congress has repeatedly modified the kind and extent of aid the SBA may provide to SBICs. In 1964 Congress authorized the SBA to make loans under Section 303 not only directly but also in cooperation with private lending institutions. Pub.L. No. 88–273, § 3, 78 Stat. 146 (1964). In 1967 Congress greatly expanded the SBA's lending power when it gave the SBA authority under Section 303(b) to purchase debentures of SBICs and, more important, for the first time provided for SBA "leveraging" by establishing as a limit on the amount of debentures the SBA could purchase as 300 percent of the SBIC's paid-in capital and surplus. Pub.L. No. 90–104, Title II, § 205, 81 Stat. 268, 270 (1967).[9] Through 1971, with each modification of the way in which the SBA could provide aid, Congress maintained a limit on the amount of that aid. Yet that limit was always defined as a percentage of the "paid-in capital and surplus" of the company.[10] Interestingly, the word "private", upon which this case turns, did not appear until 1972.

In 1972 Congress enacted the most sweeping changes in the 1958 Act to that date when it passed the Small Business Investment Act Amendments of 1972, Pub.L. No. 92–595, § 2(c), (d) 86 Stat. 1314–15 (1972) (hereinafter the "1972 Amendments"). In the 1972 Amendments Congress sought to address the particular difficulties encountered by minority small businesses in search of capital. Their difficul-

ties were greater than those of small businesses generally because of the higher costs and risks associated with minority small businesses. S.Rep. No. 1007, 92d Cong., 2d Sess. 3 (1972) (hereinafter "1972 Senate Report"). Congress created a new category of SBICs, which would invest in companies owned by persons suffering social or economic disadvantages, by adding a new subsection (d) to Section 301 of the 1958 Act— the subsection under which plaintiff Amistad was formed.[11]

In addition, in recognition of the particular burdens suffered by minority businesses, Congress enacted a new subsection (c) of Section 303 applicable only to Section 301(d) companies, dealing with the kind and amount of SBA aid they could receive. 1972 Amendments, § 2(d), 15 U.S.C. § 683(c) (1976 & Supp. IV 1980 Section 303(c) authorizes the SBA not only to purchase debentures of Section 301(d) companies, but, in order to cut the cost of such companies' debt service, also allows the SBA to purchase their preferred stock. H.Rep. No. 1428, 92d Cong., 2d Sess. 4 (1972) (hereinafter "1972 House Report"), U.S.Code Cong. & Admin.News 1972, p. 4929. It is this subsection 303(c) which is at issue in this case.

It was the ·addition of SBA authority to purchase preferred stock which necessitated the addition of the word "private" to the term "paid-in capital and surplus" in Section 303(c).[12] Until 1972 the SBA could hold only debt instruments of SBICs. Giving the SBA the power to hold equity securities as well created a possibility of confusion as to whether or not SBA holdings of preferred stock could be considered part of the SBICs "paid-in capital and surplus" for the purpose of calculating SBA leverage. Yet the amount of preferred stock the SBA

---

9. Four years later Congress added the power to guarantee debentures. Pub.L. No. 92–213, § 10, 85 Stat. 775, 776–77 (1971).

10. The 1964 amendments added that SBA aid should not exceed the 50 percent figure or $4 million, whichever is less.

11. The full text of Section 301(d) is set out at p. 44, *supra*.

12. The original version of the 1972 Amendments, S. 3337, did not contain the word "private." It was only when the text of the House version, H.R. 16732, was substituted for the language of the Senate version (though keeping the Senate bill number) that the word "private" appeared. 118 Cong.Rec. 35,376 (1972).

could hold was itself defined in terms of the SBIC's paid-in capital and surplus. Therefore, unless the SBA's holdings of preferred shares were somehow segregated from the company's other capital, the SBA could be placed in the absurd theoretical position of leveraging upon its own leveraging, presumably without limit. To accomplish the needed segregation, Congress added the word "private" to distinguish SBA-contributed capital from all other SBIC capital. As stated in the House Report accompanying the bill whose language was eventually adopted as the 1972 amendments, see n. 12 supra, "(a)s H.R. 16732 introduces preferred securities to be owned by the Administration, it becomes important to be precise in all references to capital...." 1972 House Report at 6, U.S.Code Cong. & Admin.News 1972, p. 4933.[13]

Contrary to the July 29, 1980 decision of the Comptroller General, the legislative history of Section 303(c) reveals that the presence of the word "private" serves only to distinguish SBA funds from non-SBA funds, and does not distinguish governmental funds from non-governmental funds. Nothing in the legislative history, therefore, precludes the inclusion of FRA funds in the capital upon which the SBA would base its calculation of the leveraging for which Amistad may be eligible.

It remains to be asked whether the inclusion of FRA funds in such a calculation would be consistent with the purposes of the Small Business Investment Act of 1958, as amended, and in particular with the purposes of the 1972 Amendments thereto. This court concludes that including such funds is consistent with the intent of Congress.

As noted above, in enacting the 1972 Amendments Congress sought to alleviate the extraordinary difficulties facing minority businesses in particular. It did so by creating a new category of SBICs which alone would be eligible for a new special form of SBA aid, the purchase of preferred shares. At the same time it cut in half the

amount of capital needed by such a SBIC to qualify for SBA leveraging. 1972 House Report at 6. Significantly, it eliminated for Section 301(d) companies the requirement that the SBA certify, before giving aid, that equivalent funds were not available from private sources on reasonable terms. Id. at 8. As the 1972 House Report stated:

> The elimination of these requirements is intended to recognize the contemporary realities of investing in disadvantaged concerns and afford the Administration the flexibility and authority required to tailor the need of limited SBICs to the great need for risk capital for disadvantaged businessmen. The minimum capital required for third dollar leverage is reduced from the present $1 million to $500,000. *This provision, coupled with the preferred stock substitution, is designed to encourage SBICs realistically to reach for authorized leverage, and to induce more private investors to form limited SBICs.*

Id. U.S.Code Cong. & Admin.News 1972, p. 4935. (emphasis added).

The entire thrust of the 1972 Amendments was to make sufficient credit available on reasonable terms to those most in need of it, minority groups and those otherwise socially disadvantaged who had theretofore been excluded from the free market economy which the Small Business Investment Act of 1958 was designed to protect. Inner City and Amistad have done nothing more than to act as Congress hoped private investors would act when it passed the 1972 Amendments: they have formed a limited SBIC and have reached for the authorized leverage. It would be anomalous indeed to restrict the access to credit of those the law most seeks to protect on the basis of a misguided reading of the legislative history. Consequently, this court holds that for the purposes of calculating the amount of SBA aid for which Section 301(d) companies are eligible under the leveraging provisions of Section 303(c) of the Small Business Investment Act of 1958, as amended, 15 U.S.C.

---

**13.** The word "private" was added as well to Sections 303(b) and 306(a) to avoid confusion and provide consistency. 1972 Amendments §§ 2(c)(1), 2(f); 1972 House Report at 6, 9.

§ 683(c) (1976), the SBA shall not exclude from the term "private paid-in capital and surplus" funds received from governmental entities other than the SBA.[14]

■ The court points out, however, that its holding in no way obligates the SBA to respond favorably to an application of Amistad for leveraging. So to compel SBA action is beyond the power of this court.[15] Indeed, the SBA has twice refused Amistad's application for leveraging of FRA funds for reasons other than illegality,[16] and nothing in this opinion would preclude the SBA from refusing yet another Amistad application if its refusal were neither arbitrary nor capricious.[17]

### C. *SBA counterclaim for unpaid interest on Amistad debentures*

■ In its answer to Amistad's complaint the SBA counterclaimed seeking damages for Amistad's failure to pay interest on its debentures purchased by the SBA in January 1981. The SBA attached to its answer copies of the debentures. Amistad concedes that it has not paid the interest due but argues first, that there has been a failure of consideration, releasing it from its obligation to pay, due to the SBA's refusal to leverage FRA funds. Second, Amistad argues that the SBA refusal to leverage FRA funds has so hobbled it that it is unable to make its payments.

The court rejects both of Amistad's arguments. The debentures sold by Amistad to the SBA constitute wholly separate obligations of Amistad. Nothing in the record supports Amistad's bald claim of inability to pay. Accordingly, there being no issue of fact as to Amistad's obligation on its debentures, the court shall enter summary judgment for the SBA on its counterclaim.

The government shall submit a proposed judgment for the court's consideration no later than November 16th, 1982.

---

14. The court is aware of the fact that the SBA has published in the Federal Register proposed regulations to conform to the decision of the Comptroller General. *See* 47 Fed.Reg. 35,498 (1982). Yet those regulations, even if final, would not be controlling here, since issues of statutory construction are finally for the court to resolve. *See* discussion at pp. 48–50, *supra.*

15. *See* discussion at pp. 48–49, *supra.* Moreover, plaintiffs made clear in their original argument before the court that they seek only the declaratory judgment issued by the court in this opinion, not any injunctive relief purporting to compel SBA acceptance of Amistad's application for leveraging.

16. *See* discussion at p. 45, *supra.*

17. Having resolved the issue of statutory construction in favor of plaintiffs, the court need not reach plaintiffs' argument that the SBA is equitably estopped from denying it has the power to leverage FRA funds. However, plaintiffs' contentions in this regard are not persuasive. Even assuming that plaintiffs reasonably relied on the representations of FRA and SBA officials, plaintiffs made no showing of having suffered any detriment as a consequence of that reliance, nor have plaintiffs shown any affirmative misconduct on the part of those officials, despite plaintiffs having had the opportunity to conduct limited discovery with respect to that issue. Consequently, plaintiffs have failed to meet the requirements for equitable estoppel of the government. *See TRW, Inc. v. F.T.C.*, 647 F.2d 942, 950–51 (9th Cir.1981).