**INNER CITY BROADCASTING CORPORATION, et al.**

v.

**James C. SANDERS, Administrator, U.S. Small Business Administration, et al., Appellants,**

**Federal Railroad Administration.**

**No. 83–1273.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 23, 1983.

Decided May 4, 1984.

John D. Bates, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the brief was filed), Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellants. Michael J. Ryan, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellants.

Nolan N. Atkinson, Jr., Philadelphia, Pa., for appellees. Roma J. Stewart, Washington, D.C., also entered an appearance for appellees.

Before MIKVA and EDWARDS, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This case involves a Small Business Investment Company (SBIC) that seeks financial aid from the Small Business Administration (SBA) under section 303(c) of the Small Business Investment Act of 1958, as amended, 15 U.S.C. § 683(c) (1982) (the Act). The amount of such financial aid available to an SBIC is based upon a "matching fund" ratio, whereby the more "private paid-in capital and paid-in surplus" that an SBIC can generate, the more financial aid the SBA can grant. The district court found that § 303(c) allows funds received from the Federal Railroad Administration (FRA) to be included in the "private paid-in capital and paid-in surplus" for purposes of calculating SBA aid. *Inner City Broadcasting Corp. v. Cardenas*, 554 F.Supp. 42 (D.D.C.1982). We reverse, but remand on the narrow issue of whether the Railroad Revitalization and Regulatory Reform Act of 1976 independently authorizes the SBA to include FRA funds in the calculation of SBA aid that can be made available to an SBIC.

## I. Statutory and Regulatory Framework

The Small Business Investment Act's purpose, unchanged since 1958, is to stimulate the national economy in general and the small-business segment thereof in particular by establishing a program to stimulate and supplement the flow of private equity capital and long-term loan funds which small-business concerns need ...: Provided, however, That this policy shall be carried out in such manner as to insure the maximum participation of private financing sources.

15 U.S.C. § 661 (1982). *See* The Small Business Investment Act of 1958, Pub.L. No. 85–699, 72 Stat. 689 (1958) (codified as amended at 15 U.S.C. § 661 *et seq.* (1982)) (hereinafter "the Act").

To achieve these objectives, the Act created a new type of credit institution, the small business investment company (SBIC), to provide equity capital for small businesses. 15 U.S.C. § 684 (1982). Although licensed and regulated by the SBA, the SBICs are privately-owned, privately-managed credit institutions.

Section 683 of the Act originally provided that aid was to be measured by the "paid-in capital and paid-in surplus" generated by the SBIC. Section 682, which defines the minimum capital investment which an SBIC must have, was originally defined by the same term. Section 682 authorized financial aid which could be included as "paid-in cpaital" to help the SBIC meet the minimum capital requirement. That aid also was included in the capital base for calculating § 683 aid.

In 1967, Congress eliminated the "bootstrapping" effect of SBA aid being based upon SBA aid. The Small Business Investment Act Amendments of 1967, Pub.L. No. 90–104, 81 Stat. 268 (1967), redefined minimum capital investment in terms of *"private* paid-in capital and paid-in surplus" (emphasis supplied). SBA aid could no longer be used either to help an SBIC meet the minimum capital requirement under § 682 or to calculate the additional § 683 aid to the SBIC.

In addition, the 1967 Amendments modified the calculation of § 683 aid by author-

izing the SBA to "leverage" SBIC funds. Leveraging is an incentive system for capital investment by which investments in an SBIC are matched and multiplied by the SBA in some predetermined ratio. Under the leveraging system, an SBIC thus could receive much more aid. The investment base which was to be leveraged by the SBA under the 1967 Amendments remained the SBIC's "paid-in capital and paid-in surplus."

The 1972 Amendments to the Act are particularly significant to this case. Small Business Investment Act Amendments of 1972, Pub.L. No. 92–595, 86 Stat. 1314 (1972). These Amendments provided for a new type of SBIC: a section 301(d) licensee is an SBIC which invests solely in small businesses that are owned by persons "whose participation in the free enterprise system is hampered because of social or economic disadvantages ...." 15 U.S.C. § 681(d). Special financial assistance provisions were established for the section 301(d) licensees. 15 U.S.C. § 683(c). The amount of aid available to a section 301(d) licensee is determined by a leveraging formula based upon its "private paid-in capital and paid-in surplus." *Id.*

The 1972 Amendments also redefined the leveraging base for SBA aid for *all* SBICs in terms of "private paid-in capital and paid-in surplus." Post-1972 amendments to the Act did nothing to amend or elucidate the reference to "private" capital. The case turns on the meaning of that term.

## II. Factual Background

In March 1978, representatives of Inner City Broadcasting Corporation (Inner City) met with officials of the Minority Business Resource Center (MBRC) of the FRA to secure financing for a venture capital company that would invest in minority-controlled businesses connected with the railroad industry. MBRC agreed to provide FRA funds to such a venture capital company, provided such a company was established promptly, received a section 301(d) license from the SBA, and eventually re-

ceived additional financing from the SBA based on leveraging of the FRA funds.

Subsequently, Inner City created and incorporated Amistad DOT Venture Capital, Inc. (Amistad). Amistad secured a section 301(d) license from the SBA, and MBRC provided Amistad with FRA funds. The SBA, however, refused to leverage the FRA aid which Amistad had received. It offered several reasons for this refusal, but initially did not question the legality of SBA leveraging of FRA funds. The record, in fact, contains numerous representations by the SBA of the legality of such leveraging. In 1980, the Comptroller General issued a formal decision asserting that the SBA is without the authority to leverage non-SBA governmental funds unless the law providing such funds so provides. Relying on this interpretation of its legislative authority, the SBA refused to leverage Amistad's FRA funds.

Inner City and Amistad brought suit, seeking and receiving a declaratory judgment that § 303(c) of the Small Business Investment Act authorized the SBA to leverage non-SBA governmental funds as "private paid-in capital and paid-in surplus." *Inner City Broadcasting Corp.,* 554 F.Supp. at 42. The district court did not decide whether the Railroad Revitalization and Regulatory Reform Act of 1976 (4–R Act) independently authorized the SBA to leverage FRA funds provided to section 301(d) licensees.

## III. Discussion

Appellees Inner City and Amistad argue that the word "private" should be interpreted to include non-SBA governmental funds. We find that the plain meaning and the legislative history of the Act support the SBA's position that private means private and not governmental.

### A. *Plain Meaning*

■ We follow "the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Commission v. GTE Syl-*

**158**

*vania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *G.A.O. v. G.A.O. Personnel App. Bd.,* 698 F.2d 516, 528 (D.C.Cir.1983). To determine the meaning of statutory terms, a court may consider the common usage of the term. *Consumer Product Safety Commission,* 447 U.S. at 109, 100 S.Ct. at 2056, 2057. Indeed, unless contrary indications are present, a court can assume that Congress intended the common usage of the term to apply.

■ It is beyond cavil that the common usage of "private" refers to that which is not public or governmental; it follows that "private" funds refers commonly to those which are non-governmental. Nowhere does the statutory language in § 683(c) hint that "private" has some hidden technical meaning. In addition, nowhere does the use of the term "private" in other sections of the Act indicate that "private" means anything other than nongovernmental. *See* 15 U.S.C. §§ 661, 682, 686 (1982).

**B.** *Legislative History*

Where the words are as plainly spoken as they are in § 683(c), resort to legislative history is appropriate only in rare instances. Indeed, it may even be mischievous, since legislative history should not be used to create an "ambiguity" that reflects intermediate congressional debate rather than the actual congressional resolution. " '[[A]]bsent a clearly expressed legislative intention to the contrary ... [the statutory] language must ordinarily be regarded as conclusive.' " *Bread Political Action Committee v. FEC,* 455 U.S. 577, 580, 102 S.Ct. 1235, 1238, 71 L.Ed.2d 432 (1982), citing *Consumer Product Safety Commission,* 477 U.S. at 108, 100 S.Ct. at 2056.

We turn to the legislative history of the Act in this case solely to show that, contrary to appellees' assertions, it confirms that the use of the word "private" was intentional and premeditated. We find no indication in the legislative history of the Small Business Investment Act and its amendments that Congress intended "private" to mean anything other than its plain meaning—nongovernmental.

**1.** *The 1972 Amendments*

Appellees claim, and the district court agreed, that the inclusion of the word "private" in the term "paid-in capital and paid-in surplus" in the 1972 Amendments of § 683 was necessitated by the addition of SBA authority to purchase a section 301(d) licensee's preferred stock. Congress wanted to clarify that such stock purchases could not be categorized as "paid-in capital" for additional SBA leveraging. Appellees conclude, therefore, that the word "private" serves only to distinguish SBA from non-SBA funds, and does not distinguish governmental from non-governmental funds. To support this conclusion, appellees point to a statement from a House Report which suggests only that the introduction of SBA-owned preferred securities may have stimulated the concern for precision and consistency in the terminology used to describe the leveragable capital base. H.R.Rep. No. 1428, 92d Cong., 2d Sess. 6 (1972), U.S.Code Cong. & Admin. News 1972, p. 4929. The language provides no support for appellees' argument.

The district court believed that the policy objectives of the 1972 Amendments would not be served if it interpreted "private" to mean non-governmental. Essentially, it assumed that Congress intended to maximize the financial aid to section 301(d) licensees and that, therefore, it would be anomalous to limit SBA leveraging to the base of non-governmental funding. For support, however, the court relied on an inapposite excerpt from the 1972 House Report. H.R. Rep. No. 1428, 92d Cong., 2d Sess. 8 (1972), *reprinted in* 1972 U.S. Code Cong. & Ad. News 4929, 4935. Although that excerpt explains the unique status of minority businesses under the Act, it does not indicate that Congress intended that "private" include *governmental sources of funding for purposes of the leveraging provisions of* § 683(c).

While we agree that a major objective of the 1972 Amendments was to encourage

SBICs investing in minority and disadvantaged enterprises, the legislative history indicates that Congress made a calculated choice to encourage these SBICs in a particular way—by stimulating a maximum of private, non-governmental investments. An emphasis on private, non-governmental funding is apparent throughout the Act. For example, the "Explanation of Legislation" found in the Senate Report regarding the 1972 Amendments states: "The bill relates to the authority of the … SBA … to render financial assistance to investment companies … for the sole purpose of supplementing the flow of private equity capital and long-term loan funds to small business concerns owned by disadvantaged persons." S.REP. No. 1007, 92d Cong., 2d Sess. 1 (1972); *see id.* at 2, 4; H.R.REP. No. 1428, 92d Cong., 2d Sess. 8 (1972), *reprinted in* 1972 U.S.CODE CONG. & AD.NEWS 4929, 4935 (The purpose for the increase in the aggregate government leverage was to provide "a significant incentive to increase private investment in such SBICs."); *id.* at 6, 7; *see also* 117 CONG.REC. 34,972, 34,974, 34,975 (1972) (House of Representatives); 117 CONG.REC. 30,455, 30,456 (1972) (Senate). The legislative history relied on by the district court is not to the contrary.

If "private" included all non-SBA governmental funding, the SBICs would have an incentive not to secure private, non-governmental financing, but instead to secure funding from as many federal sources as possible. Such an incentive scheme is vastly different from that which Congress envisioned. *See, e.g.,* 118 CONG.REC. 8,225 (1972) (statement of Senator Tower, introducing the Minority Enterprise Small Business Investment Company Act of 1972).

Moreover, the leveraging of governmental funds would conflict with the Act's fiscal policy of providing governmental support for SBICs in a way which minimizes governmental expenditures while maximizing non-public support, thus maintaining a high non-government to government investment ratio. *See Minority Enterprise Small Business Investment Company Act of 1972: Hearings on H.R. 13805 before the Subcommittee on Small Business of the House Committee on Banking and Currency,* 92d Cong., 2d Sess. 26 (1972) (statement of James T. Lynn, Undersecretary of Commerce); H.R.Doc. No. 194, 92d Cong., 2d Sess. 5 (1972) (message from the President of the United States).

In sum, we find nothing in the legislative history of the 1972 Amendments to suggest that "private" should be given any meaning other than its plain meaning in the statute—non-governmental—and that such interpretation is consistent with the policy objectives of the 1972 Amendments.

2. *Congressional Silence Regarding SBA Regulations*

Appellees next contend that for seven years SBA regulations interpreted the Act as authorizing the SBA to leverage non-SBA federal investments in section 301(d) licensees and that congressional silence in the face of these regulations should be construed as agreement. We reject this argument. The regulations did not clearly express such authorization. Moreover, the circumstances do not warrant an implication of congressional assent to the regulations.

The regulations to which appellees refer were adopted first in 1974 to carry out the provisions concerning section 301(d) licensees authorized in the 1972 Amendments to the Act. 13 C.F.R. § 107.101(d)(2) (1974) is the crucial regulation:

(i) A section 301(d) Licensee may include non-private funds (e.g. funds granted under Title VII of the Economic Opportunity Act of 1964, as amended) as Private Capital for purposes of sections 302(a), 303(c), and 306 of the Act [15 U.S.C. §§ 682(a), 683(c), 686]: *Provided, however,* That the minimum capital of $150,000 specified by section 302(a)(1) of the Act [15 U.S.C. § 682(a)(1)] may not include nonprivate funds and that for Leverage purposes nonprivate funds will be included in Private Capital only to the extent that private funds totaling at least ten per-

cent of the nonprivate funds are also included. . . .

(ii) For purposes of this paragraph (d)(2), "nonprivate funds" shall mean funds obtained, directly or indirectly from another agency or department of the Federal Government . . . .

Appellees interpret this regulation as asserting SBA authority, pursuant to the Small Business Investment Act, to leverage *all* sources of federal funds held by a section 301(d) licensee. We find, however, that this regulation is ambiguous and may suggest instead that SBA's recognition that statutes other than the Small Business Investment Act, such as the Economic Opportunity Act of 1964 (as it existed in 1974), explicitly authorized the SBA to leverage federal funds held by an SBIC. The agency's initial explanations of the regulation supports our interpretation. *See* 38 Fed. Reg. 4,519 (1973); 42 Fed.Reg. 12,037 (1977). Even though the SBA has claimed periodically, as it did earlier to Amistad, to have authority under the Act and its regulations to leverage non-SBA governmental funds, we know of no time the SBA has attempted to exercise this alleged authority—for either regular SBICs or section 301(d) licensees.

Thus, even if Congress' silence were tantamount to agreement, as appellees contend, the regulation is ambiguous in such a way that it is unclear to what Congress would have agreed—possibly only that the SBA could leverage governmental funds when a separate statute so authorized.

■ In any event, we do not find the circumstances appropriate to equate congressional silence with congressional agreement. Before we will find relevance in congressional silence, at a threshold we must be shown that Congress was "obviously aware" of the policy in question and consciously acted or did not act in response to that policy. *See Planned Parenthood Federation of America, Inc. v. Heckler,* 712 F.2d 650, 660 (D.C.Cir.1983); *Kay v. FCC,* 443 F.2d 638, 646 (D.C.Cir.1970). Here, there is no evidence whatsoever that Congress was aware of the regulation, or even considered a different meaning for the word "private".

### 3. *Other Federal Statutes*

■ Appellees contend that, in order to give effect to the policies and purposes of other federal statutes, the Small Business Investment Act must be read as authorizing the SBA to leverage governmental funds. Appellees direct us to the legislative history of provisions in two federal statutes. One of these provisions is particularly important in this case—section 906 of the 4–R Act, formerly codified at 49 U.S.C. § 1657a (1976), *repealed by* Pub.L. No. 97–449, § 7(b), 96 Stat. 2413, 2444 (1983). The other is section 105 of the Housing and Community Development Act of 1977, codified as amended at 42 U.S.C. § 5305(a)(15).

Appellees contend that statements in the legislative histories of these Acts reveal a congressional expectation that the federal funds provided under these Acts will be leveraged by the SBA. We do not need to reject or resolve this contention here. Nothing in the legislative histories cited by appellees suggests that the Small Business Investment Act would be the *source* of leveraging authority of funds provided under those other Acts. But in any case, the statements in those legislative histories cannot affect our interpretation of the Small Business Investment Act. Aside from the fact that the statements were not made in a discussion of the Small Business Investment Act, they were neither made contemporaneously with the passage of, nor by persons intimately involved with the Small Business Investment Act.

It is possible, however, that the legislative histories to which appellees refer evidence congressional intent that those other Acts independently authorize SBA leveraging of funds provided under those Acts. For purposes of this case, it is significant that the legislative history of the 4–R Act may suggest that the 4–R Act provides an independent source of authority for SBA leveraging of FRA funds. We turn to this possibility.

## IV. LEVERAGING AUTHORIZATION UNDER THE RAILROAD REVITALIZATION AND REGULATORY REFORM ACT

The district court did not decide whether the 4–R Act separately empowers the SBA to leverage FRA funds, and the issue was not briefed on appeal. The specific provision in the 4–R Act that potentially might have authorized SBA leveraging has been repealed. 4–R Act § 906, codified at 49 U.S.C. § 1657a(c)(7) (1976), *repealed by* Pub.L. No. 97–449, § 7(b), 96 Stat. 2413, 2444 (1983). This question is not moot, however, because Amistad has received, and still holds, the FRA funds for which it seeks SBA leveraging. If the 4–R Act warranted SBA leveraging prior to repeal of § 906, the FRA funds in the hands of Amistad would be entitled to the treatment then extant.

Congress has at times provided specifically for SBA leveraging of non-SBA federal funds. For example, the Community Services Act of 1974, codified at 42 U.S.C. § 2985a(a)(1) (1976), provides that Community Services Act funds shall be considered "private paid-in capital and paid-in surplus" for purposes of the Small Business Investment Act.

A brief evaluation of the pertinent provision of the 4–R Act, before it was repealed, indicates that Congress may have intended that the FRA funds be so leveraged by the SBA. The MBRC was authorized to

> participate in, and cooperate with, all Federal programs and other programs designed to provide financial, management, and other forms of support and assistance to minority entrepreneurs and businesses.

49 U.S.C. § 1657a(c)(7) (1976), *repealed by* Pub.L. No. 97–449, § 7(b), 96 Stat. 2413, 2444 (1983). While this language is somewhat vague, the legislative history may suggest that Congress intended that MBRC's funding be leveraged. *See* S.REP. No. 499, 94th Cong., 2d Sess. 44–45 (1974), *reprinted in* 1976 U.S. CODE & CONG. AD. NEWS 14,132; *Department of Transportation and Related Agencies Appropriations for Fiscal Year 1978: Hearings Before a Subcommittee of the Committee on Appropriations: United States Senate,* 95th Cong., 1st Sess. 2132 (1977); *Department of Transportation and Related Agencies Appropriations for Fiscal Year 1979: Hearings Before a Subcommittee of the Committee on Appropriations of the United States Senate,* 95th Cong., 2d Sess. 936 (1978).

We remand so that the facts necessary to interpret this Act can be brought forth by the parties. It would be helpful to discover how the MBRC interpreted its governing statute, as well as any other light to be shed through a thorough review of the 4–R Act's legislative history.

## V. CONCLUSION

We hold that section 303(c) of the Small Business Investment Act does not allow the SBA to include funds received from governmental entities for leveraging purposes. On that issue, the decision of the district court is reversed. We remand this case to the district court to decide in the first instance whether section 906 of the 4–R Act of 1976 separately empowered the SBA to so leverage FRA funds.

*It is so ordered.*